# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CRIMINAL CASE NO. 1:18-cr-00187-MR

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff/Appellee, ) | |
| ) | |
| ) | |
| vs. ) | **O R D E R** |
| ) | |
| ) | |
| REBECCA MORIELLO, ) | |
| ) | |
| Defendant/Appellant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's appeal from the Judgment entered by the Magistrate Judge on July 17, 2018. For the reasons that follow, the Judgment is affirmed.

## I.    PROCEDURAL BACKGROUND

On December 5, 2017, the Government charged the Defendant Rebecca Moriello in a Bill of Information with failing to comply with the lawful direction of an authorized individual while on property under the authority of the General Services Administration (GSA), in violation of 41 C.F.R. §§ 102-74.365, 102-74.385, and 102-74.450 ("the § 102-74.385 violation"), and impeding and disrupting the performance of official duties by government

employees while on GSA property, in violation of 41 C.F.R. §§ 102-74.365, 102-74.390, and 102-74.450 ("the § 102-74.390 violation"). [Doc. 1]. For each violation, the Defendant faced a maximum possible penalty of 30 days' imprisonment and a fine of no more than $5,000. See 41 C.F.R. §§ 102-74.390, 102-74.450; 18 U.S.C. § 3571. On December 28, 2017, the Defendant filed five pretrial motions, including two motions to dismiss. [Docs. 7, 8, 9, 10, 11]. The Government responded to the Defendant's motions to dismiss on January 11, 2018. [Docs. 18, 19]. Judge Keesler denied both motions to dismiss on February 1, 2018. [See Feb. 1, 2018 Minute Order].

The matter proceeded to a bench trial before Judge Keesler on July 12, 2018. Judge Keesler found the Defendant guilty of both offenses charged in the Bill of Information and imposed a $2,500 fine and a $10 assessment. [Doc. 38].

The Defendant now appeals. [Doc. 41]. Pursuant to a Scheduling Order entered by this Court on July 30, 2018, and after being granted an extension of time, the Defendant filed her appellate brief on September 13, 2018. [Doc. 46]. After receiving an extension of time to do so, the Government filed a response brief on October 26, 2018. [Doc. 48].

Having been fully briefed, this matter is ripe for disposition.

2

## II. STANDARD OF REVIEW

An appeal of a judgment imposed by a United States magistrate judge is reviewed by this Court using the same standards as are applied by the Court of Appeals in reviewing a district court judgment. See 18 U.S.C. § 3742(h); see also Fed. R. Crim. P. 58(g)(2)(D) ("The scope of the appeal [of a judgment entered by a magistrate judge] is the same as in an appeal to the court of appeals from a judgment entered by a district judge."). Accordingly, the Court must "assess challenges to the sufficiency of the evidence by viewing it -- including all reasonable inferences to be drawn therefrom -- in the light most favorable to the Government." United States v. Bursey, 416 F.3d 301, 306 (4th Cir. 2005). Further, the Magistrate Judge's findings of fact are reviewed only for clear error, while his conclusions of law are reviewed de novo. United States v. Landersman, 886 F.3d 393, 406 (4th Cir. 2018). The Court reviews any evidentiary rulings for an abuse of discretion. United States v. Hill, 322 F.3d 301, 304 (4th Cir. 2003).

## III. FACTUAL BACKGROUND

Viewed in the light most favorable to the Government, the evidence adduced at trial established the following facts.

On June 29, 2017, Immigration Judge Barry J. Pettinato was conducting an asylum hearing at the Immigration Court facility located at

3

5701 Executive Center Drive in Charlotte, North Carolina. [Doc. 45: Bench Trial Transcript ("T.") at 64]. Because the nature of the testimony that can be given in an asylum hearing, it is a private, closed hearing. See 8 C.F.R. § 208.6(a)-(b). The Defendant, who is a licensed attorney, was present in the gallery when the judge called the case, but she was not there to represent any party. [Id]. In fact, she did not have any connection to the case. [T. at 45-46, 64-65]. When Judge Pettinato inquired of the asylum-seeker's attorney why the Defendant was present in the closed courtroom, the asylum-seeker's attorney said he had given the Defendant permission to sit in and observe. [T. at 64]. Judge Pettinato pointed out that the attorney's permission was insufficient because only the asylum-seeker herself could waive confidentiality protections. Judge Pettinato therefore required the attorney to confer with his client and obtain that waiver. [T. at 64-65]. At this point, the Defendant was seated a couple of rows behind the bar, in the middle of the benches on the right-hand side of the courtroom. [T. at 65].

At first, Judge Pettinato was consumed with the preliminary matters of getting the hearing started. [T. at 65-66]. Once things settled down, however, he looked up, and he could see the Defendant holding her cell phone at about chest level. [T. at 66]. As Judge Pettinato observed the Defendant, he could see that she was typing on the phone. [Id.]. The

4

behavior continued for some time, and Judge Pettinato testified that he found the Defendant's use of her phone in the gallery to be "very distracting." [T. at 67]. He further testified as follows:

> Ms. Moriello had specifically asked for permission to come into a private confidential asylum hearing which is very rarely allowed. And I assumed it was so that she could learn something from it. The entire time that Ms. Moriello was sitting in my courtroom I did not see her paying attention to what was going on with the attorney or with the witness. She was pretty much non-stop glued to her cell phone and she was texting away, and I found it to be very distracting. I also found it to be very disrespectful given that she had asked for permission to sit in on this very sensitive matter, and she was not paying attention.

[T. at 67-68].

Judge Pettinato summoned the courtroom bailiff, Protective Security Officer ("PSO") Pinar Bridges, who was in uniform and who had been stationed at the front of the courtroom near the bench. [T. at 42-43, 45, 67]. Judge Pettinato went off the record to speak with PSO Bridges and specifically instructed PSO Bridges to "go ask Ms. Moriello to put away her phone and to stop texting." [T. at 67]. PSO Bridges went to approach the Defendant, while Judge Pettinato went back on the record to continue with the proceeding. [Id.].

5

Unbeknownst to Judge Pettinato, during the preliminaries, PSO Bridges had already approached the Defendant once about the same problem. PSO Bridges testified that she is particularly vigilant about monitoring the use of electronic devices when she acts as bailiff for asylum proceedings because she knows that such proceedings are confidential and people often share sensitive information which, if disclosed, could endanger their safety. [T. at 44].

When the asylum proceeding in question began, PSO Bridges saw the Defendant in the gallery looking down, and when she approached for a closer look, PSO Bridges saw that the Defendant was using her phone. [T. at 45-46]. PSO Bridges testified that the policy in the Charlotte Immigration Court was to allow attorneys to use their phones inside the immigration courtrooms for "business purposes." [Id.].[1] However, PSO Bridges also testified that she

---

[1] PSO Bridges' testimony is consistent with a sign posted outside of the courtroom which states as follows:

USE OF ELECTRONIC DEVICES PROHIBITED

Persons in EOIR [Executive Office for Immigration Review] space must turn off their electronic devices (e.g., smartphone, laptop). **For clear and immediate business purposes only**, attorneys and other representatives are exempt from this rule and may use electronic devices in EIOR space.

No person in permitted to use any device to take audio or video recordings, or still photographs.

knew the Defendant was not representing anybody and therefore had no immediate business inside the courtroom. [Id.]. Furthermore, PSO Bridges knew that the Defendant maintained an office on the first floor of the same building where the Immigration Court was located. [T. at 54]. She therefore saw no possible need for the Defendant to use the phone to manage outside business from inside the courtroom during the asylum proceeding. [T. at 53-54]. PSO Bridges therefore politely asked the Defendant to turn off her phone, explaining that the Defendant could not use her phone in the courtroom. [T. at 46]. The Defendant ignored PSO Bridges' direction, telling PSO Bridges that it was "her right" to use her phone in the courtroom. [T. at 47]. The Defendant continued to use her phone in the gallery, despite PSO Bridges' request.

PSO Bridges then approached the Defendant a second time, on Judge Pettinato's instructions. PSO Bridges testified that she went to the Defendant and told her that the Judge had directed that she "get off the phone." [T. at 47-48]. The Defendant became argumentative, telling PSO Bridges that she could "do whatever she wants" that she was using her phone for business purposes. [T. at 47-48]. The conversation continued,

_____

[Doc. 40-1: Govt. Ex. 1-11] (emphasis added).

with PSO Bridges repeatedly conveying to the Defendant that the instruction came from the Immigration Judge. [T. at 48]. PSO Bridges testified that the Defendant responded to her direction by stating that "she can do whatever she wants." [T. at 48].

Judge Pettinato observed PSO Bridges talking "back and forth" with the Defendant for a considerable period of time. While their conversation was not loud, Judge Pettinato found the exchange to be visually disruptive. [T. at 69]. At some point, Judge Pettinato observed that the Defendant got up and moved to the back of the courtroom, as PSO Bridges was still trying to get her to either shut off the phone or leave the courtroom. [T. at 69-70]. PSO Bridges requested for the assistance of a second security officer. Both security officers were standing over the Defendant in the back corner attempting to get her to stop using the cell phone to no avail. PSO Bridges then left in order to call the Charlotte-Mecklenburg Police Department to come and assist in the matter, in light of the Defendant's refusal to cooperate. [T. at 70].

Eventually, Judge Pettinato called a recess in the ongoing asylum hearing and left the bench. [T. at 48]. While Judge Pettinato was in recess, the Defendant continued to sit in the courtroom and to use her phone, even though there was no hearing in progress. The CMPD officers who

8

responded to PSO Bridges' call arrived around that time, and they asked PSO Bridges to convey again, in their presence, the Immigration Judge's command to the Defendant to stop using her cell phone. [T. at 48-49]. Therefore, accompanied by the officers, PSO Bridges re-entered the courtroom and told the Defendant to get off her phone and to leave the courtroom. [T. at 48-49]. The Defendant still refused. [T. at 48]. The CMPD officers then escorted the Defendant out of the courtroom and spoke with her about leaving the premises. According to PSO Bridges, the Defendant in response "basically said that [the] Judge cannot tell her what to do. That's her right. She can be on the phone. It's business purposes only." [T. at 49].

Two Federal Protective Services ("FPS") Officers arrived to assist PSO Bridges as well. One of the FPS Officers wrote the Defendant a Central Violations Bureau ("CVB") citation accusing her of violating 41 C.F.R. § 102-74.385. [T. at 60-61].

The Defendant admitted to using her cell phone use in the courtroom gallery on June 29, 2017. [T. at 116]. She further admitted that she ignored PSO Bridges' first command to stop. [Id.]. She confirmed that she ignored PSO Bridges' second command to stop as well, despite PSO Bridges explicitly informing her that the instruction was coming from Judge Pettinato. [T. at 116-17]. When asked why she disregarded Judge Pettinato's

9

instruction, as transmitted through PSO Bridges, the Defendant testified, "I thought [PSO Bridges] was lying. I thought she was making it up." [T. at 117]. The Defendant herself acknowledged, however, that the Immigration Judge had the discretion to ban cell phone use -- even for business purposes -- in his courtroom when the use of the phone posed a disruption.[2]  [T. at 120].

The Defendant's own witness, Kofi Bentsi-Enchill, confirmed that the Defendant's conduct caused an interruption in the asylum hearing that was underway.  Mr. Bentsi-Enchill was counsel for the asylum-seeker during the hearing in question; he was the one who obtained his client's waiver to allow the Defendant to sit in and observe.  [T. at 100-01].  When defense counsel asked Mr. Bentsi-Enchill whether he recalled "any disturbance whatsoever" during the course of the hearing, Mr. Bentsi-Enchill testified as follows:

> I do recall during the course of the hearing -- I'm not sure exactly what happened because my focus was, you know, toward the front of the court, and she was seated in the back.  As I mentioned, I believe I heard the deputy or the security guard say something about -- well, made some kind of comment.  I can't recall exactly what the statement made was, but he addressed Ms. Moriello.  And then the Judge at that point interrupted the hearing.

---

[2] The Defendant denied that her cell phone use was a disruption to Judge Pettinato.  [T. at 120].

[T. at 101-02].  Mr. Bentsi-Enchill also recalled "some discussion about whether or not Ms. Moriello was recording the hearing," although he disclaimed any personal knowledge of whether she was.  [T. at 102].

## IV.  DISCUSSION

### A.    Statutory and Regulatory Background

Before turning to the issues raised by the Defendant in her appeal, the Court first examines the statutes and regulations underlying the Defendant's offenses of conviction.

The Defendant was found to have violated two of the conduct prohibitions contained within the Federal Management Regulation ("FMR"). The FMR governs the day-to-day operations of properties under the authority of the Government Services Administration ("GSA").  See 41 C.F.R. §§ 102-2.5, 102-2.10.  These regulations were promulgated pursuant to 40 U.S.C. § 1315(c)(1), through which Congress delegated authority to the GSA to establish such rules.   The FMR's conduct prohibitions are located within Subpart C of Title 41, Subtitle C, Chapter 102, Subchapter C, Part 102 of the Code of Federal Regulations.   The introduction to Subpart C provides, in pertinent part, as follows:

**To whom does this subpart apply?**[3]

The rules in this subpart apply to all property under the authority of GSA and to all persons entering in or on such property. Each occupant agency shall be responsible for the observance of these rules and regulations. Federal agencies must post the notice in the Appendix to this part at each public entrance to each Federal facility.

41 C.F.R. § 102-74.365.

The FMR sections that follow this introductory provision establish rules of conduct for persons on property controlled by the GSA, <u>see</u> 41 C.F.R. §§ 102-74.370 through 102-74.455, and penalties for violations of those rules of conduct, <u>see</u> 41 C.F.R. § 102-74.450. <u>See also</u> 40 U.S.C. § 1315(c)(2). The Magistrate Judge found that the Defendant violated two of those rules of conduct: (1) the rule penalizing persons who fail to follow lawful directions, 41 C.F.R. § 102-74.385, and (2) the rule prohibiting disorderly conduct, 41 C.F.R. § 102-74.390.

**B.    Sufficiency of the Evidence**

The Defendant first challenges the sufficiency of the evidence submitted by the Government with respect to Counts One and Two.

---

[3] The title of each regulation in the FMR poses a question, while the body of each regulation answers that question. The GSA believes that this "'plain language' regulatory style" is desirable because it is "easy to read." 41 C.F.R. § 102-2.140.

12

In assessing the sufficiency of the evidence presented to a magistrate judge in a bench trial, the Court "must uphold a guilty verdict if, taking the view most favorable to the Government, there is substantial evidence to support the verdict." United States v. Landersman, 886 F.3d 393, 406 (4th Cir. 2018) (quoting United States v. Armel, 585 F.3d 182, 184 (4th Cir. 2009)). "Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id.

### 1. Count One

In Count One of the Bill of Information, the Government charged the Defendant with a violation of 41 C.F.R. § 102-74.385, which provides as follows:

> **What is the policy concerning conformity with official signs and directions?**
>
> Persons in and on [GSA] property **must at all times comply** with official signs of a prohibitory, regulatory or directory nature and **with the lawful direction of** Federal police officers and **other authorized individuals**.

41 C.F.R. § 102-74.385. In order to convict the Defendant of this regulation, the Government was required to prove: (1) that the Defendant was on property under the authority of GSA; (2) that the Defendant knowingly failed

13

to comply with the direction of a Federal police officer or other authorized individual; and (3) that the direction with which the Defendant failed to comply was lawful.  It is not disputed that the Defendant was on property under the authority of GSA.  It is further undisputed that that the Defendant received a direction from an Immigration Judge, communicated through that Judge's bailiff, to stop using her cell phone in the courtroom.  The Defendant, however, argues that the Government failed to prove beyond a reasonable doubt that the Immigration Judge was an "authorized individual" to issue such command and, thus, failed to prove that the command was "lawful." [Doc. 46 at 11-16, 17-20].

While the Defendant couches this argument in terms of whether the evidence was sufficient to support her convictions, her argument actually relates to questions of law, not to the sufficiency of the evidence.  The factual evidence presented – that is, that an Immigration Judge issued a directive, communicated through the courtroom bailiff, to the Defendant to stop using her cellphone in his courtroom and that the Defendant refused to abide by that directive – is not in dispute.  Rather, the Defendant challenges the Magistrate Judge's legal conclusions that the Immigration Judge is an "authorized individual" and that his command to stop using a cell phone within his courtroom was a "lawful direction" within the meaning of § 102-

14

74.385.  These are questions involving the interpretation of the applicable regulations, which presents a question of law that the Court reviews *de novo*. See Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013); Frahm v. United States, 492 F.3d 258, 262 (4th Cir. 2007).

The Court construes a regulation employing the same rules applicable to construing statutes.  Harris v. Norfolk S. Ry. Co., 784 F.3d 954, 962 (4th Cir. 2015).  If the language of the regulation "has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written."  Gilbert v. Residential Funding LLC, 678 F.3d 271, 276 (4th Cir. 2012) (citation and internal quotation marks omitted).  If, however, the language is ambiguous, "the intent of Congress or the Agency concerning the disputed language must be resolved through application of various settled rules of construction and interpretation, including analysis of the underlying statute's structure and purpose."  Am. Alternative Ins. Co. v. Sentry Select Ins. Co., 176 F. Supp. 2d 550, 554-55 (E.D. Va. 2001) (citations omitted).

Here, § 102-74.385 requires all persons on GSA property to comply "with the lawful direction of Federal police officers and other authorized individuals."  41 C.F.R. § 102-74.385.  While the term "authorized individuals" is not explicitly defined in the FMR, the plain and ordinary meaning of that

15

term clearly encompasses immigration judges who are holding court in courtrooms located on GSA property.

An examination of other federal statutes, regulations, and case law confirms this interpretation. Pursuant to regulations promulgated by the Attorney General, immigration judges "are attorneys whom the Attorney General appoints as administrative judges within the Office of the Chief Immigration Judge to conduct specified classes of proceedings, including [removal] hearings…." 8 C.F.R. § 1003.10(a). In conducting removal hearings and other proceedings assigned to them, immigration judges are authorized to "exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation." 8 C.F.R. §1003.10(b). In deciding such cases, immigration judges are authorized to "exercise their independent judgment and discretion and may *take any action* consistent with their authorities under the Act and regulations *that is appropriate and necessary for the disposition of such cases*." Id. (emphasis added). Furthermore, immigration judges are granted the authority in removal hearings to "receive and consider material and relevant evidence, rule upon objections, and *otherwise regulate the course of the hearing*." 8 C.F.R. § 1240.1(c) (emphasis added). Based on this authority, both the Executive Office for Immigration Review (EOIR) and the federal courts have held that

16

an immigration judge has the authority to maintain control of his or her courtroom.  See The United States Department of Justice, EOIR, Ethics and Professionalism Guide for Immigration Judges, at 3 ("at times an Immigration Judge must be firm and decisive to maintain courtroom control")[4]; see also Stevens v. Osuna, 877 F.3d 1293,1305-07 (11th Cir. 2017) (discussing immigration judge's authority and obligation to maintain control over the courtroom).

These authorities make clear that an immigration judge, like any judge who is presiding over a matter, is authorized to give commands in the courtroom in order to ensure the efficiency, integrity, and solemnity of the proceedings.  It therefore follows, as a matter of common sense, that an immigration judge presiding over a hearing in a courtroom that is located on GSA property is an "authorized individual" within the meaning of 41 C.F.R. § 102-74.385.

Here, Judge Pettinato testified that he found the Defendant's use of her cell phone in the courtroom during a sealed asylum proceeding to be distracting and disrespectful, and that is why he told her to stop.  [T. at 67-68].  Common sense dictates that a directive issued by an Immigration Judge

_____

[4] Available at: https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf (last visited June 6, 2019).

to an observer in the courtroom to cease engaging in conduct that was distracting to the Judge is clearly a "lawful direction" within the meaning of the regulation.[5]

For all these reasons, the Defendant's challenge to her conviction under Count One is rejected.

### 2. Count Two

In Count Two of the Bill of Information, the Government charged with the Defendant with a violation of 41 C.F.R. § 102-74.390, which provides as follows:

> **What is the policy concerning disturbances?**
>
> All persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct or exhibiting other conduct on property that—
>
> (a) Creates loud or unusual noise or a nuisance;
>
> (b) Unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots;

---

[5] The Defendant was charged with disobeying the commands of Judge Pettinato, as transmitted by PSO Bridges. As such, the Court need only resolve whether Judge Pettinato is an "authorized individual" for the purposes of this appeal. Nevertheless, the Court finds that the plain and ordinary meaning of "authorized individuals" would also encompass a private security officer acting as a courtroom bailiff in an immigration courtroom, as the purpose of having a uniformed bailiff in a courtroom is to maintain proper order, even without the presiding judge exerting his or her authority. Thus, even if the Government had charged the Defendant with disobeying the lawful directives of PSO Bridges, the Defendant's conviction would still have been proper.

18

(c) Otherwise impedes or disrupts the performance of official duties by Government employees; or

(d) Prevents the general public from obtaining the administrative services provided on the property in a timely manner.

41 C.F.R. § 102-74.390. The Defendant contends that her conviction on Count Two must be overturned because the Government failed to prove that PSO Bridges was a "Government employee," for purposes of establishing that the Defendant's conduct impeded or disrupted any Government employees' official duties within the meaning of subsection (c).

Again, the Defendant conflates a question of fact with a question of law. What constitutes a "Government employee" within the meaning of § 102-74.390(c) is a question of law for the Court to determine. See Frahm, 492 F.3d at 262; Leone v. United States, 910 F.2d 46, 49 (2d Cir. 1990) ("Whether a person is a government employee or an independent contractor is a question of federal law."). In determining whether someone is a federal employee, courts have held that "the strict control test, as well as principles of agency, govern [the] inquiry." Leone, 910 F.2d at 49 (analyzing claim under Federal Tort Claims Act). The critical factor is the Government's ability to supervise the day-to-day activities of the employee in question. See

generally Robb v. United States, 80 F.3d 884, 887-890 (4th Cir. 1996) (analyzing claim under Federal Tort Claims Act).

The relevant facts are not in dispute. At the time of the events in question, PSO Bridges was a Protective Security Officer working for GSA at the Charlotte Immigration Court. FPS Special Agent Skrtic testified that Protective Security Officers who "have the power to detain, conduct administrative searches, [and] put people on notice[,]" but they cannot make full arrests. [T. at 19]. PSOs have the authority to enforce the FMR on GSA property and to give instructions to visitors to federal facilities. [Id.]. At the Charlotte Immigration Court, PSOs work security at the entrance to the facility, and they serve in the immigration courtrooms in a bailiff capacity similar to that of the Court Security Officers who serve this Court. [Id.]. PSO Bridges' direct supervisor was a lieutenant in her organization, but she testified that she is required to follow the instructions of Judge Pettinato when she works in his courtroom. [T. at 52]. Judge Pettinato confirmed his authority to direct the activities of bailiffs within his courtroom. [T. at 85-86].

In sum, PSO Bridges worked every day in a federal facility, for a company providing security services at that federal facility under the supervision of the FPS, and she was subject to the supervision of the Immigration Judges in the Charlotte Immigration Court on a daily basis. In

20

every meaningful sense, she was a "Government employee" within the meaning of the regulation.

Further, it is evident that the Defendant's conduct disrupted PSO Bridges in the performance of her official duties. PSO Bridges had to leave her post at the front of the courtroom near the bench in order to ask the Defendant to put her cell phone away. When the Defendant's behavior continued and was noted by Judge Pettinato, PSO Bridges had to return to the gallery to convey to the Defendant Judge Pettinato's instruction to cease the use of her phone. When the court had recessed and the Defendant still refused to comply with Judge Pettinato's instructions, PSO Bridges had to summon the CMPD and other federal officers to the scene to address the issue. Clearly, the Defendant's conduct disrupted the performance of PSO Bridges' official duties, as well as those duties being carried out by other federal police officers on the premises.

Regardless of whether PSO Bridges was a "Government employee" or not, however, there was also ample evidence presented to the Magistrate Judge that the Defendant's conduct also disrupted the performance of *Judge Pettinato's* duties. Judge Pettinato testified that the Defendant's use of her phone in the gallery was a distraction to him in overseeing the asylum proceeding that was underway. [T. at 67]. He also testified that the

21

disturbance caused by her extended exchange with PSO Bridges in the gallery was visually disruptive for him. [T. at 69]. While the Defendant seeks to minimize the Judge's testimony [see Doc. 46 at 17], the Court must credit Judge Pettinato's testimony when conducting a review of the sufficiency of the evidence.

For these reasons, the Court concludes that there was sufficient evidence to convict the Defendant on Count Two.

## C. Void for Vagueness Challenge

Next, the Defendant challenges the denial of her pretrial motion to dismiss this prosecution on the grounds that 41 C.F.R. §§ 102-74.385 and 102-74.390 are unconstitutionally vague.

"The void-for-vagueness doctrine requires that penal statutes define crimes so that ordinary people can understand the conduct prohibited and so that arbitrary and discriminatory enforcement is not encouraged." United States v. Smith, 703 F. App'x 174, 177 (4th Cir. 2017), cert. denied, 138 S. Ct. 697 (2018) (quoting United States v. Klecker, 348 F.3d 69, 71 (4th Cir. 2003)). "[A] court considering a vagueness challenge must determine if the statutory prohibitions are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." United States v. Whorley, 550 F.3d 326, 333 (4th Cir. 2008) (citation and

internal quotation marks omitted). "A statute is impermissibly vague if it either (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement." Giovani Carandola, Ltd. v. Fox, 470 F.3d 1074, 1079 (4th Cir. 2006) (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)) (internal quotation marks omitted). The determination of whether a regulation is impermissibly vague must be made on a case-specific basis. See United States v. Baldwin, 745 F.3d 1027, 1031 (10th Cir. 2014) (Gorsuch, J.) ("[U]nder governing precedent, a defendant won't be heard to complain about the vagueness of a criminal law as it applies to *other* defendants in *other* cases. He may complain *only* about the vagueness of the law as it applies in *his own case.*") (emphasis in original).

In United States v. Cassiagnol, the defendant challenged his conviction for disorderly conduct and unwarranted loitering under 41 C.F.R. § 101-19.304, the predecessor to the disorderly conduct regulation at issue. 420 F.2d 868 (4th Cir. 1970). The Fourth Circuit rejected that argument, reasoning as follows:

> The regulation in question made it clear that 'unseemly and disorderly conduct' and 'unwarranted loitering * * * and assembly' on this property were proscribed. It would not require a high degree of intelligence or understanding for one to reasonably

23

conclude that breaking through a line of United States marshals who were lined up between the demonstrators and the Pentagon, a government building of highly strategic importance to the defense of the United States, could subject him to charges for disorderly conduct or that remaining on government property which was closed to the public during nonbusiness hours (according to the rules and regulations of GSA posted in the demonstration area) beyond the expiration of the demonstration permit could subject him to charges for disorderly conduct or unwarranted loitering and assembly.

Id. at 873-74.

Here, the Defendant was charged with "imped[ing] or disrupt[ing] the performance of official duties by Government employees" and with failing to comply "with the lawful direction of . . . authorized individuals" on government property.  41 C.F.R. §§ 102-74.385, 102-74.390.  It does not require a high degree of intelligence or understanding for a reasonable person to conclude that refusing to comply with the directive of an immigration judge or a courtroom bailiff to cease using a cell phone during a closed removal proceeding in an immigration courtroom could subject a person to charges for failing to follow lawful directions and disrupting the performance of government employees' official duties.  See Cassiagnol, 420 F.2d at 873-74; see also Baldwin, 745 F3d at 1032 (rejecting vagueness challenge to §§ 102-74.385 and 102-74.390, noting "it's clear enough from the terms of the

24

regulations before us that, whatever else they do or don't proscribe, driving off while a uniformed officer is busy issuing a warning, and doing so over the officer's instructions to stop, counts as disobeying that person's directions and disrupting performance of his official duties"). Such an outcome should have been particularly apparent to someone such as the Defendant, who is in trained in the law and is a regular practitioner in the immigration courts. The Defendant's vagueness challenge is rejected.

## D. Unconstitutional Delegation of Congressional Authority

Next, the Defendant argues that the regulations at issue violate both the separation of powers doctrine and the Tenth Amendment's delegation of rights to the People.

As noted *supra*, the subject regulations were promulgated pursuant to 40 U.S.C. § 1315(c)(1), through which Congress delegated authority to the GSA to establish such rules. The Defendant cites no authority in support of her argument that this delegation was unconstitutional. Moreover, the Defendant completely ignores the fact that the Fourth Circuit has already addressed this issue with respect to § 1315's predecessor, 40 U.S.C. § 318, and held that this delegation of authority was proper. See Cassiagnol, 420 F.2d at 876; see also United States v. Crowthers, 456 F.2d 1074, 1077 (4th Cir. 1972). In Cassiagnol, the Fourth Circuit concluded that the statute was

a proper delegation of authority because the power delegated to GSA was limited to property under its control, restricted the authority of GSA to "make needful rules and regulations to maintain and protect such property and ensure its use for the authorized purpose," and specified the limits of punishment. <u>Cassiagnol</u>, 420 F.2d at 876. Noting that similar grants of authority were common for national parks, forests, and battlefields, the Fourth Circuit stated that "[t]o require Congress specifically to enumerate GSA's duties would be to require the impractical, if not the impossible." <u>Id.</u>

The <u>Cassiagnol</u> Court's analysis of § 40 U.S.C. § 318 is dispositive here. Like its statutory predecessor, § 1315 describes a general policy, designates a specific agency to implement the regulations, specifies the parameters of that authority, and requires the regulations to be posted in a conspicuous manner. Accordingly, the Court concludes that 40 U.S.C. § 1315 is not an unconstitutional delegation of power by Congress. The Magistrate Judge correctly denied the Defendant's motion to dismiss based on a violation of the separation of powers doctrine.

### E.    Rule 404(b) Evidence

For her final assignment of error, the Defendant contends that the Magistrate Judge erred in excluding impeachment evidence under Rule 404.

During the Defendant's cross-examination of Judge Pettinato, defense counsel asked: "Have you had complaints that have been sustained against you?" Judge Pettinato responded, "I have not." [T. at 87]. Defense counsel then proceeded to ask Judge Pettinato whether there had been a complaint of bias made against him for stating on the record during a hearing that there appeared to be "a lot of asylum fraud." [T. at 88]. The Government objected to this line of questioning. Specifically, the Government argued that questioning the Immigration Judge about such complaint was not proper impeachment because it was neither a crime, a conviction, or an act of truthfulness or untruthfulness. [Id.]. Defense counsel argued that such questioning was proper under Rule 404 as demonstrating the bias of the witness. [T. 92]. When the Magistrate Judge sustained the Government's objection, defense counsel made an offer of proof of various complaints filed with the Assistant Chief Immigration Judge (ACIJ) for which Judge Pettinato received "oral or written counseling". The Defendant now argues that she should have been permitted to question Judge Pettinato further about these complaints, and that the documentation of these complaints should have been admitted as evidence of Judge Pettinato's bias.

It appears that the Defendant's counsel sought to introduce this evidence via two different arguments. First, he sought to employ the approach under Federal Rule of Evidence 608(b). He asked Judge Pettinato whether he had had any complaints "sustained" against him. When Judge Pettinato answered in the negative [T. at 87], counsel sought to cross-examine him with seventeen complaint forms. [Doc. 37-1]. There are several problems with this tactic. First, the complaint forms do not show any of the complaints being "sustained." They show that Judge Pettinato had received "oral counseling" or "written counseling" in several of these, but there is nothing on the face of the forms that show that such counseling was anything more than Judge Pettinato being informed of the complaint. They show no sanction being imposed or even any finding of wrongdoing by Judge Pettinato. Second, Rule 608(b) states that such "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court *may*, on cross-examination, allow them to be inquired into…." Fed. R. Evid. 608(b) (emphasis added). Allowing such inquiry is in the discretion of the trial judge. Here, the Magistrate Judge, in the exercise of his sound discretion, disallowed the evidence. That would be appear to be the end of the inquiry using the approach under Rule 608(b).

28

Apparently recognizing that his Rule 608(b) argument was foreclosed by the Magistrate Judge's ruling, defense counsel argued that the complaints were nonetheless admissible under Rule 404(b). There are several problems with this approach. Rule 404(b) allows for evidence of "a crime, a wrong, or other act" to prove any relevant point other than "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The proffered documents, however, do not tend to prove any such "crime, wrong, or other act." They are merely records that demonstrate someone has *alleged* such an act. Even if the documents themselves fall within the hearsay exception for records of regularly conducted activity (i.e., the "business records exception" under Federal Rule of Evidence 803(6)), that does not cover the second level of hearsay for the out-of-court statements by the complainants to the record keeper. Likewise, the documents do not fall within the exception for "factual findings from a legally authorized investigation," Fed. R. Evid. 803(8)(A)(iii), because there are no findings on these documents, only a record of the allegations.

Next, the documents do not tend to prove what the Defendant argues they prove. The Defendant argues that these documents demonstrate Judge Pettinato's bias against immigration attorneys. Only three out of the

29

seventeen complaints, however, pertain to Judge Pettinato's treatment of immigration attorneys: one alleges that Judge Pettinato made an inappropriate remark regarding the ethnicity of an attorney representing an asylum seeker [Doc. 37-1 at 3]; another alleges that Judge Pettinato threatened an attorney with sanctions for making an argument that the Judge found to be frivolous [id. at 4]; and a third alleges unspecified "inflammatory" comments about an attorney [id. at 5].  Most of the others pertained to alleged procedural shortcomings in Judge Pettinato's actions, and such things as being rude to a technician or even questioning the authority of the BIA.  [Id.].

Even if the evidence tended to show what the Defendant argues, using this evidence in this manner would construe Rule 404(b) in a manner so as to completely eviscerate the limitation in Rule 608(b) in instances where the trial court has found that the extrinsic evidence of the witness's veracity is venturing too far afield of the issues at hand.  This would be directly contrary to Rule 404(a)(3), which allows for the admission of character evidence concerning a witness only as set forth in Rules 607, 608, and 609.

Moreover, the Defendant's argument demonstrates that this evidence was not actually being offered to impeach Judge Pettinato's credibility as a witness, but rather to insinuate that he had initiated a selective prosecution

of the Defendant because she is an immigration attorney.  Judge Pettinato, however, did not initiate this prosecution.   This was not a contempt proceeding.  The Defendant was cited by an FPS officer, and the case was prosecuted by the Department of Justice.  Judge Pettinato was a *witness* in the trial, not a prosecutor.

For all these reasons, the Magistrate Judge's exclusion of the complaint documents and the cross-examination of Judge Pettinato regarding the complaints was proper and consistent with Rules 404 and 608 of the Federal Rules of Evidence.

In sum, the Court concludes that there is sufficient evidence to support the Defendant's conviction; the regulations under which the Defendant was convicted are not constitutionally infirm; and the Magistrate Judge did not abuse his discretion in limiting the admission of impeachment evidence.  Accordingly, the Court concludes that the Judgment entered by the Magistrate Judge should be affirmed in all respects.

## **O R D E R**

**IT IS, THEREFORE, ORDERED** that the Judgment of the Magistrate Judge is hereby **AFFIRMED**.

The Clerk of Court is **DIRECTED** to provide copies of this Order to counsel for the Defendant, counsel for the Government, and the United States Marshal's Service.

**IT IS SO ORDERED**.

Signed: June 7, 2019

Martin Reidinger
United States District Judge